UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

REV. GARY THOMPSON,      )
                         )
        Plaintiff,       )
                         )
vs.                      )        Case No. 4:04CV607  CDP
                         )
BI-STATE DEVELOPMENT     )
AGENCY, d/b/a METRO      )
                         )
        Defendant.       )

## MEMORANDUM AND ORDER

Gary Thompson drove a bus for Bi-State Development Agency. When he rear-ended a truck, Bi-State ruled that the accident was preventable and sought to impose discipline because this was his second preventable accident in a one-year period. Thompson claimed that he "blanked out" before the accident, although the bus camera showed that he had applied the brakes, albeit too late to avoid the accident. Thompson had been treated for schizo-affective disorder for several years, and he was off work after the accident for several months while Bi-State attempted to determine if he was fit to return to driving a bus. He was eventually allowed to return to work. Bi-State held a disciplinary hearing relating to the accident and imposed a standard discipline of five days suspension and three days of retraining. Thompson then sought disability retirement and never returned to driving

a bus.  He now sues Bi-State, alleging that its handing of the accident was actually retaliation for his filing previous racial discrimination and retaliation lawsuits, and that it constructively discharged him because of his disability.

I will grant Bi-State's motion for summary judgment on both of Thompson's claims.  Thompson has been unable to point to any evidence that would support his claims, and Bi-State has shown that the undisputed evidence fails to support any inference that it retaliated against Thompson or constructively discharged him.

## I.    Background

Thompson drove a bus as an employee of Bi-State from approximately July of 1991 until the events that gave rise to this lawsuit.  He filed two previous racial discrimination and retaliation lawsuits against Bi-State in this court.  The first was filed in February of  2001 and was settled in October of that year.  The second was filed in August of 2003, and summary judgment was granted in favor of Bi-State in December of 2004.

The accident at issue in this case occurred on June 4, 2003.  Thompson rear-ended a truck while returning an empty bus to the bus facility, injuring both himself and the two occupants of the truck.  Thompson said that he had been suffering from headaches and stress related to his work which caused him to "blank out."   Bi-State determined that this accident was "preventable," which is defined in its regulations

to mean one in which the driver's actions contributed to the accident. In determining that the accident was preventable, Bi-State reviewed numerous items including an on-board digital video recorder that showed Thompson had braked four seconds before the collision, the police report, Thompson's report, the supervisor's report, and a safety report regarding the accident. This was Thompson's second preventable accident within a twelve month period.

After the accident Thompson was placed on sick leave and was evaluated by a number of physicians, including psychiatrists. He had a history of treatment for schizo-affective disorder, and the various medical reports following the accident contradicted one another. Thompson's treating psychiatrist, Dr. Nowotny, found him fit to return to work on July 18, 2003. At about the same time, Thompson was examined by Dr. H. Bryan Rogers, who concluded that Thompson should not operate a motor vehicle. Thompson was then evaluated by Dr. Carlos M. Yu, a neurologist, who determined that Thompson's episode of "blanking out" was an isolated incident. Upon receiving Dr. Yu's report, Dr. Rogers released Thompson to return to work in a report dated October 24, 2003. Thompson was also evaluated by Dr. Wayne Stillings, a psychiatrist, on October 8, 2003, who determined, in part because of Thompson's long and continuing history of serious psychiatric symptoms, that he was not able to safely perform the functions of a bus operator.

On October 24, 2003, Bi-State informed Thompson that it had determined that he was unable to perform the duties of a bus operator and would not be allowed to return to work. Bi-State also informed Thompson that he was eligible for a disability pension beginning January 1, 2004, and explained to him how to apply for these benefits. Following a request by Thompson's union, Bi-State then sent Thompson for an independent psychiatric evaluation by Dr. Duane Hagan. Dr. Hagan found that Thompson's schizo-affective disorder was under good control with medications, "except for the stress of being off work and his general distrust of management." Dr. Hagan recommended that Thompson be allowed to return to work, stating that this should relieve his stress. He did express concerns about factors such as Thompson's preoccupation with discrimination and distrust of management, and stated that if Thompson continued to pursue grievances and complaints about management, he should be rerefered to Dr. Hagan for treatment. Thompson was then cleared by Bi-State to return to work.

Thompson returned to work in early December of 2003. Upon Thompson's return, Bi-State held a disciplinary hearing to address the June 4, 2003, accident. As a result of the hearing, Thompson was given a five-day suspension from work and was required to do three days of retraining. During the hearing Thompson was offered probation in lieu of a suspension, as was common practice at Bi-State, but

Thompson refused the probation. That same evening, Thompson called his union representative and indicated that he was tired of being harassed by Bi-State and wanted to take his disability retirement. He never actually returned to driving a bus.

Thompson's disability pension was officially approved on March 15, 2004. He also applied for Social Security disability benefits and the Social Security Administration granted those benefits and found he was disabled as of June 4, 2003.

Thompson filed the present suit on May 17, 2004, alleging that Bi-State violated both Title VII and the Americans with Disabilities Act. Specifically, Thompson alleges that he was subjected to a disciplinary hearing and disciplinary measures in retaliation for returning to work and for filing complaints of discrimination against Bi-State. Thompson also alleges that he was forced to retire from Bi-State because of his disability. Bi-State seeks summary judgment on all claims.

## II.    Discussion

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court views the facts and inferences from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving

party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party has met this burden, the nonmoving party may not rest on the allegations in its pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

### A.    Title VII Retaliation

As set out above, Thompson filed lawsuits against Bi-State in February of 2001 and in August of 2003, alleging racial discrimination and retaliation.  His current complaint alleges that the December 2003 disciplinary hearing -- which resulted in discipline against him for the June 2003 accident -- was retaliation against him for filing his previous lawsuits and for exercising his right to return to work after the June accident.

Title VII prohibits retaliation with respect to personnel decisions and employment actions that discourage or punish attempts to enforce rights under the statute.  42 U.S.C. § 2000e-3(a).  In the absence of direct evidence of

discrimination, Title VII claims are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).  The McDonnell Douglas burden-shifting analysis "governs the order and allocation of proof for retaliation claims."  Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1048 (8th Cir. 2005).

Under the McDonnell Douglas approach, a plaintiff must first establish a prima facie case of discrimination.  Burdine, 450 U.S. at 252.  To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) the two events were causally connected.  EEOC v. Kohler Co., 335 F.3d 766, 772 (8th Cir. 2003).  If the prima facie case is met, the burden shifts to the defendant to produce "a legitimate, non-retaliatory reason for the action it took against the plaintiff."  Id.  If the defendant satisfies its burden, the plaintiff must then "present evidence that (1) creates a question of fact as to whether [the defendant's] reason was pretextual and (2) creates a reasonable inference that [the defendant] acted in retaliation."  Smith v. Allen Health Sys., 302 F.3d 827, 833 (8th Cir. 2002).

Bi-State contends that Thompson cannot establish a prima facie case of retaliation because there is no evidence showing any causal connection between the

previous lawsuits and the December 2003 hearing. I agree.

The only evidence of a causal connection between the previous protected activity and the hearing is one of time, and that is a very weak connection. In the Eighth Circuit, "generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1989). Indeed, a litigant's "burden to show a causal connection between a protected activity and the adverse action at issue does not disappear merely because the history between employer and employee is long and contentious." Henderson v. Ford Motor Co., 403 F.3d 1026 (8th Cir. 2005). Moreover, "the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules..." and intervening acts of unprotected conduct serve to erode any purported causal connection suggested by the temporal proximity of protected conduct and adverse employment action. Kiel, 169 F.3d at 1136; see also Scroggins v. University of Minnesota, 221 F.3d 1042 (8th Cir. 2005).

Thompson filed his second lawsuit in August of 2003 (while he was off work after the June accident), and his disciplinary hearing was held as soon as he reported back to work in December of 2003. This time line is an insufficient basis to raise an inference of retaliation or to establish a prima facie case. The hearing was held as

soon as Thompson returned to work after the June accident, and the discipline imposed was exactly what was provided for in Bi-State's employee manual for an accident of this sort. There is simply no connection between the disciplinary hearing and the prior lawsuits.

Thompson makes several arguments in an attempt to avoid summary judgment: he argues that the accident was itself a result of his disability and that Bi-State's characterization of it as a "preventable" accident was retaliatory; he argues that scheduling the hearing as soon as he returned to work was retaliatory; he argues that Bi-State's delay in paying a settlement on one of the prior lawsuits shows retaliation; and he argues that Bi-State's not allowing him to return to work in October and suggesting that he take disability retirement was retaliation. None of these are alleged as acts of retaliation in his complaint, but even if they were properly alleged, they would fail.

Thompson appears to contend that the June accident itself was somehow Bi-State's fault -- by causing him excessive stress and therefore exacerbating his mental disorder -- and that therefore the accident was not "preventable." This argument -- even if it could be accepted as true, which would take a great leap of imagination -- still would not show retaliation. "The employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel

departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." Kiel, 169 F.3d at 1136 (quoting Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995)). Bi-State's determination that the accident was preventable was supported by the evidence before it. Additionally, the discipline was proper under Bi-State's personnel policies, and there is no evidence from which any inference of retaliation can be drawn. Thompson's argument that the stress of working for Bi-State caused him to rear-end the truck and that Bi-State's characterization of the accident was therefore retaliation is simply nonsensical.

Thompson also appears to argue that the hearing itself was an act of retaliation because it was scheduled as soon as he returned to work, but again there is simply no evidence to support this argument. The undisputed evidence showed that the hearing was scheduled in the normal course of business, and that Bi-State normally would hold such a hearing as soon as possible after an accident. Bi-State had no reason to schedule the hearing until Thompson returned to work.

There is also no evidence to support Thompson's claim that Bi-State's initial determination that he could not return to work and suggestion that he apply for disability retirement was retaliatory for his prior two lawsuits. During the time he

was off work there were many different medical reports provided, and Bi-State's initial reliance on the report of two doctors that Thompson should not return to work had no connection to his prior lawsuits. Indeed, when the union pressed for yet another exam, Bi-State followed the recommendations of that doctor and allowed Thompson to return to work.

Finally, the proposition that Bi-State retaliated against Thompson by not promptly paying a settlement in another case is not alleged in the complaint, and there is no evidence in the record to show that any delay actually occurred.

Thompson has presented no evidence that the discipline he received or any other action of Bi-State was related to his prior lawsuits. Rather, the record shows that Thompson was involved in a preventable accident and Bi-State legitimately held a hearing about the accident and disciplined Thompson in a way that was consistent with its employment policies. Even if Thompson could establish a prima facie case of retaliation, the undisputed evidence shows that Bi-State had a legitimate, non-discriminatory reason for disciplining Thompson, specifically that he was involved in two preventable vehicular accidents within a one year period. For these reasons, Thompson's retaliation claims under Title VII fail.

## B.    Americans with Disabilities Act

Thompson's second count claims that he elected to take his disability

retirement only because Bi-State had made his working conditions intolerable by its continuing acts of harassment. He alleges that this violates the Americans with Disabilities Act because the last doctor to examine him indicated that he was fit to work so long as he avoided stress and stressful situations. His complaint alleges that Bi-State's holding the hearing so quickly upon his return and subjecting him to the five-day suspension and three-day retraining was designed to increase his stress and to force him to retire.

The Americans with Disabilities Act makes it unlawful for an employer to discriminate against individuals with disabilities. Claims brought pursuant to the Americans with Disabilities Act are also evaluated under the burden-shifting framework of <u>McDonnell Douglas</u>. <u>Kratzer v. Rockwell Collins, Inc.</u>, 398 F.3d 1040, 1044 (8th Cir. 2005). To establish a prima facie case under the Americans with Disabilities Act, Thompson must show: "(1) that he has a disability within the meaning of the ADA, (2) that he is qualified to perform the essential functions of the job, with or without reasonable accommodation, and (3) that he suffered an adverse employment action because of his disability." <u>Epps v. City of Pine Lawn</u>, 353 F.3d 588, 591 (8th Cir. 2003).

"While it is true that a plaintiff cannot state an adverse employee action if he voluntarily resigned, circumstances that rise to a constructive discharge--that is, one

in which an employee had no choice but to quit because of the employer's actions--are also considered an adverse employment action." Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 717 (8th Cir. 2003). "A plaintiff claiming constructive discharge must show that a reasonable person would have found the conditions of employment intolerable and that the employer either intended to force the employee to resign or could have reasonably foreseen that the employee would do so as a result of its actions." Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1017 (8th Cir. 1999). "To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly." West v. Marion Merrell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995) (quoting Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 473 (8th Cir. 1990)). "An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996).

Thompson testified in his deposition that he decided to take a disability pension in December of 2003 because he believed that Bi-State was going to harass him. He made this decision only a few days after he was cleared to return to work, and before he actually began working again. He contacted his union representative about seeking a disability pension on the same day the disciplinary hearing was held by Bi-State. Although he argues that the five-day suspension and three days of

retraining created intolerable working conditions, he recognizes that this was standard discipline for the infraction he committed.

There is no evidence that Bi-State applied this discipline in an effort to force Thompson to take a disability pension. See Summit v. S-B Power Tool, 121 F.3d 416, 421 (8th Cir. 1997) ("To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit.").  In holding the disciplinary hearing, Bi-State followed its employee guidelines and the evidence showed that this sort of hearing and discipline was a normal practice of Bi-State.  Thompson testified in his deposition that he was not claiming he should receive a special exemption from employee discipline, but he has provided no evidence that could show that by following its normal policies and enforcing its normal disciplinary rules, Bi-State was trying to make Thompson's working conditions intolerable.  He appears to argue that any action that Bi-State could take against him, for any possible violation of the rules, would be designed to create an intolerable working condition.  These self-serving and illogical arguments notwithstanding, there is simply no evidence in the record that Bi-State held the hearing for any impermissible reason.  For these reasons, Bi-State is entitled to judgment as a matter of law with respect to Thompson's claims under the Americans with Disabilities

Act.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Bi-State's Motion for Summary

Judgment [#24] is GRANTED.

A separate Judgment in accord with this order is entered this same date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 7th day of September, 2005.